UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          No. 1:21-cr-00117-JAW
                                  )
NAPOLEAN GONZALEZ,                )
A/K/A/ "GUILLERMO GONZALEZ"       )

**ORDER ON GOVERNMENT'S MOTION IN LIMINE**

In anticipation of trial, the Government files a motion in limine seeking the admission at trial of a 1985 news article and other general evidence of the Defendant's involvement in a prior insurance fraud scheme.[1]  The Government claims the news article is self-authenticating under Federal Rule of Evidence 902(6) and is admissible as an ancient document under Federal Rule of Evidence 803(16).  The Defendant objects to its admissibility, contending that admission of the article and related evidence should be excluded pursuant to Federal Rules of Evidence Rules 401, 403, and 404(b).[2]  Based on the record before it, the Court concludes that the news article must be excluded from trial during the Government's case in chief because its probative value is exceeded by the risk of unfair prejudice.  The Court's conclusion is limited to presentation by the Government during its case in chief.  The Court declines to rule on whether the news article or the Defendant's admissions to the agents about the article would be admissible for impeachment, if the Defendant

---

[1]       Although the Government did not file a motion in limine, the Court has recharacterized the Government's Brief in Support of Admission of Evidence (ECF No. 78) as a motion in limine since it is more precise than a generic motion.

[2]       The Court has likewise recharacterized the Defendant's Opposition to the Government's Brief in Support of Admission of Evidence (ECF No. 79) as a response to the Government's motion in limine.

testifies, as the parties did not address this issue, or if this evidence could become admissible based on the Defendant's positions at trial.

## I.     BACKGROUND

### A.     Procedural Background

With jury trial set for August 17, 2023 through August 18, 2023, the Government filed its trial brief on July 25, 2023. *Gov't's Trial Br.* (ECF No. 61). On July 27, 2023, Napoleon Gonzalez filed his trial brief. *Def.'s Trial Br.* (ECF No. 66). On August 4, 2023, the Court held a final pretrial conference at which it noted an evidentiary question raised in the parties' trial briefs regarding the prior acts of Napoleon Gonzalez and an insurance fraud scheme, particularly with regard to a 1985 news article published in the New York Daily. *Minute Entry* (ECF No. 73). At the final pretrial conference, the Court ordered the Government to file further briefing on this evidentiary question by August 7, 2023 and ordered Napoleon Gonzalez to reply by August 8, 2023.

On August 7, 2023, the Government filed its motion in limine seeking admission of the news article and other evidence of Napoleon Gonzalez's prior acts. *Mot. In Limine RE Newspaper Articles* (ECF No. 80) (*Gov't's Mot.*). On August 8, 2023, Napoleon Gonzalez responded. *Resp. to Mot. in Limine* (ECF No. 81) (*Def.'s Opp'n*).

### B.     The 1985 News Article

With the headline, "The Unearthing of an Insurance Scheme", on May 18, 1985, the New York Daily News published an article written by Robert Friedman, its

special correspondent, concerning an unusual life insurance fraud scheme in Puerto Rico. *Gov't Mot.*, Attach. 1, *News Article* at 1 (*News Article*). The article stated that Raul Diaz Rosario, a "wandering indigent", had been "run over and killed by an automobile." *Id.* The article alleged that Napoleon Gonzalez had paid someone $7,000 for Mr. Diaz Rosario's body, identified Mr. Diaz's body as his own, dressed Mr. Diaz's body in Mr. Gonzalez's military uniform, complete with Mr. Gonzalez's ribbons and medals, arranged to have Mr. Diaz's body buried in the Bayamon National Cemetery, which is for military veterans from Puerto Rico, and had the tomb inscribed, "Napoleon G. Gonzalez, technical sergeant, Air Force, Vietnam." *Id.* The article added that Mr. Gonzalez had convinced his sister to participate in this elaborate fraud, including identifying Mr. Diaz's body as his. *Id.*

Having effectively buried himself, for legal purposes, Mr. Gonzalez assumed the identity of Guillermo Antonio Gonzalez, his deceased brother, who had died in 1934 before Mr. Gonzalez was born. *Id.* Mr. Gonzalez returned to Isabela, a small town on the west coast of Puerto Rico, and lived and worked under his real name, Napoleon Gonzalez. *Id.* Napoleon Gonzalez was married with children. *Id.* The article asserts that Mr. Gonzalez figured that no one in Isabela would learn about a death and burial in the San Juan area. *Id.*

The article offers two motives for this scheme. *Id.* The first is that Mr. Gonzalez had been a member of the notorious, clandestine, pro-independence gang, Los Macheteros and had left the group. *Id.* Los Macheteros, however, was not an organization one just left, and they were looking to kill him. *Id.*

A second possible motive was insurance fraud. *Id.* Mr. Gonzalez had recently purchased a $300,000 life insurance policy on his own life and after his staged death, he planned to pay off the recently incurred loans on his newly acquired home and three recently purchased automobiles. *Id.* Mr. Gonzalez filed a claim for the insurance proceeds from National Life Insurance Co. and the matter was set before a judge. Mr. Gonzalez appeared in court as Guillermo Gonzalez and told the judge that he was Napoleon Gonzalez's sole heir. Mr. Gonzalez warned the judge that some people might claim they were Napoleon Gonzalez's children, but he knew his brother had never married and he told the judge not to believe these children if they came forward.

Something did not sit right with the judge, and he told National Life Insurance Co. to withhold payment of the life insurance proceeds and to investigate the claim. Ultimately the investigation led back to the Bayamon National Cemetery, where the body of Mr. Diaz was exhumed and positively identified as Mr. Diaz, not Mr. Gonzalez. *Id.*

## C.    Defendant's Statements and Other Evidence of the Insurance Scheme

The Government submits two excerpts from interview transcripts that it intends to introduce during its case in chief at trial. *Gov't's Mot.*, Attach 2, *Excerpt of Interview Transcript with Detective Ross*; *Gov't's Mot.*, Attach 3, *Excerpts of Interview with SA Dos Santos and SA Giroux.* In the January 23, 2020 interview with Detective Ross, Mr. Gonzalez discusses both the Guillermo and the Napoleon identities, saying he does not know why he uses both identities and acknowledging

that his identity is a puzzle for the Government to figure out.   *Excerpt of Interview Transcript with Detective Ross* at 10; 14.  But the first interview does not mention the New York Daily News article.  *Id.* at 1-15.  There is an oblique reference to Napoleon Gonzalez dying in 1984, but the fraud scheme involving Mr. Diaz is not mentioned.

The second attachment is an interview on September 10, 2020 between two Special Agents Dos Santos and Giroux and Mr. Gonzalez.  *Excerpts of Interview with SA Dos Santos and SA Giroux* at 1.  There is only a passing reference to a newspaper article:

> AGENT DOS SANTOS:  So what about in 1984 when you faked your own death?
>
> MR. GONZALEZ:  In 1984, that came out in the article.
>
> AGENT DOS SANTOS:  Yes it did.  And it is on your criminal record because you were arrested.

*Id.* at 30:7-12.  Agent Dos Santos and Agent Giroux proceeded to question Mr. Gonzalez about the 1984 life insurance fraud scheme but without reference to the newspaper article.  During the discussion, Mr. Gonzalez substantially admitted the substance of the news article.  For example, one exchange is as follows:

> AGENT GIROUX:[3]  You faked your death.  You paid $7,000 to purchase a corpse.
>
> MR. GONZALEZ:  What is it?
>
> AGENT GIROUX: You paid.  You bought a body.
>
> MR. GONZALEZ:  I did.

---

[3]      The transcript misspells Agent Giroux's last name as Gerreu. *See Excerpts of Interview with SA Dos Santos and SA Giroux* at 1; *Gov't's Mot.* at 3, n.3.

AGENT GIROUX:  And then you had your sister Carmen identify it as you.  Yes?

MR. GONZALEZ:  That's true.

AGENT GIROUX:   And then you tried to claim life insurance?

MR. GONZALEZ:  I did not.

AGENT GIROUX:  You didn't go - -

MR. GONZALEZ:  Yes, I did.  Yes, I did (indiscernible),.

AGENT GIROUX:  You did, yes?

MR. GONZALEZ:  Yes, that is true.

AGENT GIROUX:  And you went back to living as Napoleon on the other side of the island?

MR. GONZALEZ:  What?

AGENT GIROUX: You went back to living your life with your wife and your two children on the other side of the island after faking your own death?

MR. GONZALEZ:  Yes.

*Id.* at 54:11-55:8.

## II.   THE PARTIES' POSITIONS

### A.   The Government's Brief in Support of Admission of Evidence

The Government submits that the Court should admit the news article as a self-authenticating ancient document under Rules 902(6) and 803(16) because it is relevant to the offenses charged and is not unduly prejudicial to the Defendant. *Gov't's Trial Br.* at 15-16.  The Government further submits that "to the extent there are additional levels of hearsay within the document, the article is not submitted for

the truth of its assertions . . . but as context for questions investigators asked of [Mr.] Gonzalez" and of statements that he "confirmed the accuracy of . . . in a recorded interview." *Id.* According to the Government, "the 1985 News Article formed a crucial link in the investigation that allowed case agents to challenge the defendant's innocent explanation for the death record in the Napoleon identity." *Gov't Mot.* at 5.

The Government contends that "[i]n the event that this Court denies admission of the 1985 News Article, [it] would seek to at least elicit testimony concerning the existence of an article, if not its specific contents, to help explain an investigative step in resolving the defendant's true identity." *Id.* at 6. The Government "would further seek to introduce the defendant's recorded statements concerning his longitudinal use of both the Napoleon and Guillermo identities, including those statements admitting to the insurance fraud scheme." *Id.* The Government "submits that the evidence also supports that the insurance fraud scheme is 'inextricably intertwined' with an overarching fraudulent scheme, and intrinsic to the charged offense—making a Rule 404(b) analysis unnecessary." *Id.* at 7.

While the Government argues that no Rule 404(b) analysis is necessary, it urges that if the Court undergoes a Rule 404(b) analysis, "[s]uch evidence is permissible . . . because such acts are part of a common scheme by [Mr.] Gonzalez to use the Napoleon and Guillermo identities in concert to engage in fraudulent activity for financial gain." *Gov't Trial Brief* at 14. The Government asserts that this "scheme led directly to the issuance of a death record in the Napoleon identity," and

the "introduction of the evidence of the insurance fraud scheme rebuts the defendant's characterization of this death record as a simple mistake." *Gov't's Mot.* at 8. The Government notes that "[w]hile the earliest instance of passport fraud in Count 2 occurred in 2017 (by necessity, due to the statute of limitations), the government has obtained evidence that the defendant obtained a passport in the Guillermo identity at least as early as 1977, and the defendant has stated that he first obtained a passport in this identity in the mid-1960s . . . [and v]iewed in this light, the insurance fraud scheme is merely one branch of the defendant's longitudinal use of the Napoleon and Guillermo identities." *Id.* The Government submits that although "the Social Security fraud may be different in nature than insurance fraud, it represents a different opportunity to use both identities in concert to financially benefit that did not present itself until well-after the insurance fraud scheme, when both identities reached retirement age." *Id.*

## B.    Napoleon Gonzalez's Opposition

Mr. Gonzalez first argues that while the news article and the life insurance scheme are "certainly part of the back story of the government's investigation" and "in conjunction with the defendant's attempt to provide an innocent explanation for his death record . . . permit the government to impeach the defendant without first testifying," they are not "relevant to the offenses charged in the indictment." *Def.'s Opp'n* at 2. He submits that "[t]he proposition that [Mr.] Gonzalez faked his own death and attempted to obtain life insurance proceeds in Puerto Rico in 1984 has no bearing on whether the defendant falsely represented himself to be Guillermo

Gonzalez while collecting Social Security benefits in Maine decades later." *Id.* at 3. Mr. Gonzalez further submits that "[i]f he were cross-examined, then his contradictory answer might qualify as an instance of conduct bearing on his character for untruthfulness under Evidence Rule 608(b)" but "extrinsic proof of his innocent explanation for his death record would not be admissible because it is collateral." *Id.*

Mr. Gonzalez next argues that "[e]ven if the newspaper article and the defendant's statements regarding insurance fraud were relevant to the elements of the offenses charged, their probative value would be substantially outweighed by the danger of unfair prejudice." *Id.* at 4. According to the Defendant, "[a]dmission of the article and the defendant's related statements presents a substantial risk that the jury will feel compelled to punish the defendant again for conduct for which he has already been punished," especially given that the details of the scheme include "the purchase of a corpse and the fraudulent military burial" which may "provoke the jury's instinct to punish." *Id.*

Finally, Mr. Gonzalez argues that the "insurance fraud scheme is neither intrinsic to the scheme charged in the indictment nor part of a common plan pursuant to Evidence Rule 404(b)" because "similarity of conduct, by itself, is not a basis to find that other acts are part of a common scheme or plan." *Id.* (quotations omitted). Mr. Gonzalez parallels this case to *United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000), where "the defendant used the same methodology . . . to pursue separate opportunities for financial benefit," which he asserts "is generally true in the case of Mr. Gonzalez, at least if the two schemes are characterized as plans involving the use

of the Guillermo identity." *Id.* at 5. He insists that "[b]eyond that single commonality, however, the methods employed in the insurance scheme and those employed in the alleged benefits scheme are *not* the same," and the Government "cannot square the holding of *Vourdakis* with its position in the case of Mr. Gonzalez." *Id.* (emphasis in *Def.'s Opp'n*). According to Mr. Gonzalez, "[t]o argue that the defendant intended to commit Social Security fraud because he previously committed insurance fraud is to suggest nothing more than that he has a dishonest character and acted in conformity with that character at the time in question." *Id.* at 6.

## III.   GENERAL LEGAL STANDARDS

"A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . .." *United States v. Abel*, 469 U.S. 45, 54 (1984). Federal Rule of Evidence 401 states that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401. "Relevancy is a very low threshold." *United States v. Cruz-Ramos*, 987 F.3d 27, 42 (1st Cir. 2021). "'[T]he evidence need not definitively resolve a key issue in the case,' but rather 'need only move the inquiry forward to some degree.'" *Id.* (citing *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 76 (1st Cir. 2010)). In the First Circuit's words, "it is no exaggeration to say that '[a] relevancy-based argument is

usually a tough sell.'" *Id.* (citing *Bielunas*, 621 F.3d at 76) (alterations in *Cruz-Ramos*).

Relevant evidence is generally admissible, while "[i]rrelevant evidence is not admissible." FED. R. EVID. 402. However, "[t]he Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

Federal Rule of Evidence 404(b) states that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). This evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). *See also United States v. Lynn*, 856 F.2d 430, 435 n.11 (1st Cir. 1988) (noting that the "laundry list of admissible purposes for evidence of prior bad acts' contained in Rule 404(b)(2) "is not exhaustive").

"To admit evidence of prior bad acts, a trial court must find that the evidence passes two tests. First, the evidence must have 'special relevance' to an issue in the case such as intent or knowledge, and must not include 'bad character or propensity as a necessary link in the inferential chain.'" *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000) (quoting *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996)). "Second, under Rule 403, evidence that is specially relevant may still be

excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.*  "Courts should be sensitive that 'there is always some danger that the jury will use [Rule 404(b) other act] evidence not on the narrow point for which it is offered but rather to infer that [a party] has a' certain propensity, particularly where the evidence is 'explosive.'" *Jordan v. Labombarde*, No. 2:17-cv-00025-JHR, 2021 U.S. Dist. LEXIS 124883, at *3 (D. Me. July 4, 2021) (quoting *United States v. Gilbert*, 229 F.3d 15, 25 (1st Cir. 2000) (citation and internal quotation marks omitted)).

## IV.   DISCUSSION

### A.   The Admissibility of the Daily News Article

#### 1.   Legal Standard

##### a.   The Rules

Federal Rule of Evidence 803(16) provides:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . .
***Statements in Ancient Documents***.  A statement in a document that was prepared before January 1, 1998, and whose authenticity is established.

Federal Rule of Evidence 901 provides:

The following items of evidence are self-authenticating; they require no external evidence of authenticity in order to be admitted: . . . ***Newspapers and Periodicals*** Printed material purporting to be a newspaper or periodical.

#### 2.   Analysis

##### a.   The 1985 News Article:   The Ancient Document Exception

The first issue is whether the 1985 news article is admissible under the ancient document exception to the hearsay rule under Rule 803(16).[4]  The Court concludes that the article does fit within the ancient document exception.  First, the document was "prepared before January 1, 1988."  FED. R. EVID. 803(16).  Thus, it meets the first requirement for admissibility under Rule 803(16).

Second, the Court turns to authentication.  Rule of Evidence 901(b)(8) provides that an ancient document is authentic if it "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."  On its face, the Daily News article appears to meet each of these criteria.  Even though the current whereabouts of Mr. Newman, the New York Daily News special correspondent, is not a matter of record, as the District Court in New Hampshire pointed out in *EnergyNorth Natural Gas, Inc. v. UGI Utils. Inc.*, No. 00-500-B, 2003 U.S. Dist. LEXIS 5681, at *3 (D.N.H. April 3, 2003), the author need not be available if the court has "no reason to question its reliability."  *Id.* at *3.  Furthermore, the

---

[4]       The so-called ancient document exception to the hearsay rule has been justifiably criticized. *See* DANIEL J. CAPRA, ARTICLE: ELECTRONICALLY STORED INFORMATION AND THE ANCIENT DOCUMENTS EXCEPTION TO THE HEARSAY RULE: FIX IT BEFORE PEOPLE FIND OUT ABOUT IT, 17 YALE J.L. & TECH. 1 (2015).  First, it is mislabeled.  Although a few rare documents created before January 1, 1988 might be ancient, most are merely old.  Second, it has a questionable premise, namely simply because it is old, the contents must be reliable.  But there is no evidence that people, including – as here - newspaper reporters, were more (or less) truthful before than after January 1, 1988.  Third, as Professor Capra points out, "Rule 803(16) is the only rule of evidence that equates authenticity with admissibility of hearsay." *Id.* at 9.  Thus, in *Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1375 (3d Cir. 1991), the Third Circuit wrote that "[o]nce a document qualifies as an ancient document, it is automatically excepted from the hearsay rule under Federal Rule of Evidence 803(16)." *Accord EnergyNorth Natural Gas, Inc. v. UGI Utils. Inc.*, No. 00-500-B, 2003 U.S. Dist. LEXIS 5681, at *3 (D.N.H. April 3, 2003).  After reviewing the history of Rule 803(16), its rationales, and its flaws, Professor Capra, the reporter for the Advisory Committee on the Rules of Evidence, persuasively concludes that "Rule 803(16) is a radical and irrational hearsay exception." *Id.* at 11.

New Hampshire District Judge noted that the Rules of Evidence Advisory Committee cited with approval *Dallas County v. Commercial Union Assurance Company*, 286 F.2d 388 (5th Cir. 1961), upholding the admission of a fifty-eight-year-old newspaper article without direct evidence that the article was based on personal knowledge. *EnergyNorth Natural Gas,* 2003 U.S. Dist. LEXIS 5681, at *3.

To the extent there is any controversy about the authenticity of the Daily News article, the Government has presented evidence from the Agent's interview with the Defendant that Mr. Gonzalez himself acknowledged the Daily News article. The Court concludes that the New York Daily News May 18, 1985 news article is admissible as an exception to the hearsay rule under Rule 803(16) and authenticated under Rule 902(6).

"Once a document qualifies as an ancient document, it is automatically excepted from the hearsay rule under Fed. R. Evid. 803(16)." *Threadgill*, 928 F.2d at 1367. Under this analysis, the Daily News article fits within the ancient document exception to the hearsay rule and is potentially admissible.

### b.     Rule 403 Analysis

Federal Rule of Evidence 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Even if potentially admissible, the evidence must withstand the Rule 403 balancing analysis. The Government does not argue that the article is admissible to prove the truth of its contents but only to provide the context for the agents'

investigation.  *Gov't Mot.* at 15-16 ("The government does not seek to submit the article for the truth of the matters asserted therein, but as context for the investigation, questions the investigators asked of the defendant, and his pertinent admissions").  Given the Government's concession, it is a relatively easy call to exclude the article itself, since the probative value of providing "context" is minimal and the risk of prejudice substantial.

The prejudicial impact of this 1984 evidence is extreme.  The ghoulish, cynical, brazen, and avaricious nature of Mr. Gonzalez's scheme, including the purchase of a dead body, pretending not only to be dead, but also to be his dead brother, and falsely claiming his own life insurance proceeds before a judge, are all bound to prejudice the jury against Mr. Gonzalez and make it difficult for the jury to be objective about whether he committed the currently charged crimes.  Indeed, the article would inform the jury that Mr. Gonzalez was once a member of a "subversive band," Los Macheteros, "the island's most notorious, clandestine, pro-independence group." *News Article* at 1.  The Government also argues that the article is admissible since like the current charges, the fraud in 1984 involved Mr. Gonzalez's fraudulent use of his dead brother's identity.  Describing the "defendant's longitudinal use of the Napoleon and Guillermo identities," *Gov't Mot.* at 8, the Government asserts that the "evidence supports the existence of a single fraudulent scheme spanning decades that overlaps with the charged conduct."  *Id.* at 7.  But, as just noted, to make this point, the article proves far too much, including the dead body scheme and

membership in a notorious gang, and the risk of unfair prejudice is too extreme for the article to be admissible.

### c.    Rule 404 Analysis

If inadmissible as direct evidence, the Government suggests that the article may be admissible under Federal Rule of Evidence 404(b).  *Gov't's Trial Br.* at 12-16. Rule 404 addresses evidence of "other crimes, acts, or wrongs" and provides:

> (1) *Prohibited Uses*. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

FED. R. EVID. 404.  "In assessing whether prior bad acts evidence is admissible for such a purpose, a court applies a two-step test . . . [f]irst, the court asks whether the proffered evidence truly possesses 'special' relevance . . . [and i]f it does, the court then applies Federal Rule of Evidence 403, admitting the evidence so long as its probative value is not substantially outweighed by the risk of unfair prejudice." *United States v. De La Cruz-Feliciano*, 786 F.3d 78, 82 (1st Cir. 2015). However, assuming the news article would have special relevance to whether Mr. Gonzalez has been misusing his deceased brother's identity, the Court applies the same Rule 403 analysis to the article as previously described and excludes the content of the Daily News article from trial.  Furthermore, given the content of the articles, there is the real risk that the jury will consider evidence of the details of the 1984

fraud to be evidence of Mr. Gonzalez's bad character or propensity to commit fraud, even if the Court instructed the jury against doing so.

## B.   Defendant's Statements and Other Evidence of the Insurance Scheme

If the article itself is inadmissible, the Government suggests that it should be allowed to make a general reference to the article and a specific reference to Mr. Gonzalez's 1984 insurance fraud.  In effect, the Government proposes to use the content of the Agent Dos Santos and Giroux interview of Mr. Gonzalez to demonstrate that he admitted to the prior misuse of his dead brother's identity.

As the Court understands the Government's position, it contends that this evidence is admissible as direct evidence of the crimes currently charged because he has exhibited a course of conduct in misusing his dead brother's identity since 1984. If not direct evidence of the commission of the charged crimes, the Government's fallback position is that the evidence of the factors under Federal Rule of Evidence 404(b): motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident.

### 1.   The Course of Conduct Contention

In its supplemental brief, the Government indicates that the agents' interviews of Mr. Gonzalez are admissible because the evidence supports the view that "the insurance fraud scheme is 'inextricably intertwined' with an overarching fraudulent scheme, and intrinsic to the charged offense." *Gov't's Mot.* at 7 (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)).  It is true that if only the agents' interviews are admitted, some of the more prejudicial parts of the 1985 Daily News

article—the terrorist organization allegation, for example—would not be before the jury.

Also, the Court differentiates between the January 23, 2020 interview and the September 10. 2020 interview.  The January 23, 2020 interview does not seem to contain any evidence that could be deemed unfairly prejudicial, and the contents would seem admissible as a part of the investigation of the current crimes and as Mr. Gonzalez's admissions.

The September 10, 2023 interview, portions of which are quoted here, presents a different issue.  The portions of the interview that do not expressly relate to the insurance fraud case would appear to be admissible for the same reason the January 23, 2020 interview is admissible.  However, the portion of the interview that discusses his buying a body in 1984, faking his own death, and filing a false insurance claim, all appear extremely prejudicial and, as truncated, would prompt juror confusion. Furthermore, the Government's notion that his insurance fraud in 1984 is part of the same course of conduct that resulted in his 2021 indictment is a stretch.

Based on the record before it, the Court allows the agents to discuss the contents of the January 23, 2020 interview, but before evidence of the portions of the September 10, 2023 interview dealing with the 1984 insurance fraud are introduced, the Court directs Government's counsel to approach the bench and obtain a final ruling on admissibility and not to refer to the 1984 insurance fraud issue in statements to the jury unless and until the Court rules the evidence admissible.

### 2.    Rule 404 Admissibility

As the text of Rule 404(b) indicates, prior bad act evidence may be specially relevant if, for example, it goes to the Defendant's intent, knowledge, plan, absence of mistake, or identity. FED. R. EVID. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"); *United States v. Watson*, 695 F.3d 159, 161 (1st Cir. 2012) ("[S]uch evidence may be admissible if it holds special relevance—that is, if it tends to prove a material fact apart from a mere propensity to behave in a certain way"). Here, the Court finds that Mr. Gonzalez's prior engagement in an insurance fraud scheme through the use of his deceased brother's identity is specially relevant to the charged Social Security fraud scheme because his use of his brother's identity here indicates a common plan and the absence of mistake. The Court thus analyzes the probative value of this evidence versus the likelihood of unfair prejudice to the Defendant.

The First Circuit has "focused on two factors to determine the probative value of prior bad act evidence: 'the remoteness in time of the other act and the degree of resemblance to the crime charged.'" *Varoudakis*, 233 F.3d at 119 (quoting *Frankhauser*, 80 F.3d at 648). In *Varoudakis*, the defendant "hir[ed] an individual to engage in arson of a leased car, preceding his solicitation of an individual to engage in arson of his failing restaurant." *Gov't's Mot.* at 9. The First Circuit held that the trial court erred in admitting evidence of the defendant's prior bad act related to the car fire even though it found it specially relevant because the probative value of the

evidence was substantially outweighed by the danger of unfair prejudice to the defendant. *Varoudakis*, 233 F.3d at 127.

The Government attempts to distinguish this case from *Varoudakis*, arguing that in *Varoudakis*, where the defendant "hir[ed] an individual to engage in arson of a leased car, preceding his solicitation of an individual to engage in arson of his failing restaurant," there was "no evidence of a continuing or connected scheme." *Gov't's Mot.* at 9. According to the Government, "[t]his is distinct from the instant case, in which the defendant and both identities were used to perpetuate both schemes, demonstrating a similar scheme or methodology." *Id.* Mr. Gonzalez argues that in *Varoudakis* "the defendant used the same methodology—solicitation of arson in connection with an insurance policy—to pursue separate opportunities for financial benefit . . . [and t]he same is generally true" here. *Def.'s Opp'n* at 5.

The Court agrees with Mr. Gonzalez and finds *Varoudakis* applicable here. The Court finds Mr. Gonzalez's use of the Guillermo identity in the insurance fraud scheme and the alleged Social Security fraud scheme to be no more indicative of a common or connected scheme than the *Varoudakis* defendant's hiring of an individual to engage in arson of a car in an attempt to obtain insurance money and his solicitation of another individual to engage in arson of a restaurant in an attempt to obtain insurance money. Moreover, in *Varoudakis*, only sixteen months passed between the burning of the defendant's car and the burning of his restaurant. Here, almost forty years have passed, making the prior act extremely remote in time to the presently charged offenses. *United States v. Fields*, 871 F.2d 188, 198 (1st Cir. 1989)

20

("[I]f the acts admitted under rule 404(b) are too remote in time, this substantially weakens their probative value and weighs in favor of exclusion"); *United States v. Landry*, No. CR-08-186-B-W, 2009 U.S. Dist. LEXIS 32388, at *26 (D. Me. Apr. 16, 2009) ("[T]he First Circuit has cautioned that remoteness is a special concern where, as here, the Rule 404(b) evidence is 'probative of intent'") (quoting *Fields*, 871 F.2d at 198). The Court therefore concludes that a Rule 403 analysis weighs against admission of evidence of Mr. Gonzalez's involvement in the 1984 insurance fraud scheme.

## V.    LIMITATION IN OPINION

The Court's rulings are limited in two ways. First, if Mr. Gonzalez takes the stand and testifies on his own behalf, evidence of the 1984 insurance fraud may be admissible in full for purposes of impeachment. Also, the Court is making its evaluation based on the limited information the parties have presented pretrial. If the trial evidence differs from the current record or if Mr. Gonzalez by argument or questioning, opens the door for the admission of this evidence, the Court may revisit its ruling.

## VI.    CONCLUSION

The Court GRANTS in part and DENIES in part the Government's Motion in Limine (ECF No. 80).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of August, 2023