UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA     )
                                )
            v.            )         No. 1:21-cr-00117-JAW
                                )
NAPOLEON GONZALEZ        )

**ORDER ON LOSS AND RESTITUTION AMOUNT**

A criminal defendant challenges the Government's loss and restitution calculations ahead of sentencing. The Court finds that the Government's suggested loss and restitution amounts are presently not sufficiently supported and defers ruling on these issues to allow for further factual development.

## I.    FACTUAL BACKGROUND

Napoleon Gonzalez was born in Puerto Rico in 1937. *Presentence Investigation Report- Revised with Addendum* ¶ 56 (ECF No. 113). Shortly thereafter, Napoleon's mother gave birth to another son: Guillermo Gonzalez, who would die soon after his birth in 1939. *Id.* ¶ 6

Decades later—in the 1960s—Napoleon took on his brother's identity, *id.* ¶ 7, 58, which Napoleon claims he did at the direction of Office of Special Investigations of the United States Air Force while participating in an undercover investigation. *Id.* ¶ 7. In 1965, Napoleon got a passport in Guillermo's name. *Id.* ¶ 9. Thereafter, Napoleon continued using the Guillermo identity for years, stopping in 1969, but then restarting; in time, Napoleon used the Guillermo identity to enlist in the Army

Reserves, obtain a state identification, procure a Social Security number, secure a United States passport, and even to fake his own death in 1984.[1]  *Id.* ¶¶ 9, 17, 53.

There is no clean break in identity from Napoleon to Guillermo; instead, Napoleon juggled the identities.  Napoleon's Department of Veteran's Affairs benefits card was issued in his real name.  *Id.* ¶ 8.  But his United States passport carries the name of his deceased brother.  *Id.* ¶ 10.  Napoleon's Social Security number issued in May 1954 was in his real name.  *Id.*  The one issued decades later was in his brother's name.  *Id.*  Napoleon managed to maintain state identification cards in both names and even worked long enough in each identity to secure Social Security benefits.  *Id.* ¶ 7.

In January 2020, the state of Maine's Bureau of Motor Vehicles (BMV) reviewed records using facial identification software and identified a potential match between the pictures in state IDs issued to Napoleon and Guillermo Gonzalez.  *Id.* Mr. Gonzalez's elaborate, long term ruse was about to be discovered.  The BMV detective referred the investigation to the Department of State for possible passport fraud, *id.* ¶ 8, and the Social Security Administration (SSA) and the Department of

---

[1]      A May 18, 1985 news article in the New York Daily News tells a different story.  *See Gov't's Br. in Support of Mot. in Limine*, Attach. 1, *The Unearthing of an Insurance Scam* at 1, *New York Daily News* (May 18, 1985) (ECF No. 78).  It describes an elaborate scheme in which Mr. Gonzalez buried as himself the unclaimed body of a traffic accident victim, including dressing the body in a military uniform and burying him under the name, Napoleon Gonzalez, in a military cemetery.  *Id.* Having buried Napoleon Gonzalez, he then went under the name of his deceased brother, Guillermo. *Id.*  The New York Daily News article says that this convoluted ruse was a scheme by which Napoleon sought to collect a $300,000 life insurance policy on himself.  *Id.*  When the Government sought to introduce evidence of this scheme at trial, the Court in general declined to admit it.  *Order on Gov't's Mot. in Limine* at 1-21 (ECF No. 82).  The Court added this note for whatever it is worth in explaining Napoleon Gonzalez's initial use of his dead brother's identity.  None of this explains why he used Guillermo's identity when he was younger or why he continued to use Guillermo as he grew older, and the Court has not considered the New York Daily News article in reaching the conclusions in this order.

State interviewed Mr. Gonzalez.  *Id.* ¶ 9.  Thereafter, Mr. Gonzalez acknowledged that he made a trip to Canada using a passport in his brother's name, and the Department of State seized the passport, took his photograph, and fingerprinted him. *Id.* ¶ 11.  This led the Federal Bureau of Investigations to confirm that the record in Guillermo's name belonged to Napoleon.  *Id.*  When asked, the United States Air Force noted it had no record that Mr. Gonzalez was ever affiliated with their Office of Special Investigations.  *Id.* ¶ 12.  Most relevant here, investigators determined that Napoleon was receiving SSA benefits simultaneously in both his and his deceased brother's name from about 2001 until 2020.  *Id.* ¶ 15.  During this period, the SSA administered $176,714 in Social Security benefits to a Social Security number associated with Guillermo, all received by Napoleon.  *Id.*

## II.  PROCEDURAL HISTORY

On August 18, 2023, at the end of a two-day trial, a federal jury found Napoleon Gonzalez guilty of six federal criminal charges: 1) fraud in connection with the transfer, possession, or use of a means of identification; 2) false statement in application and use of a passport; 3) use of a passport obtained by false statement; 4) social security fraud by concealment; 5) use of a social security number obtained by false statement; and 6) mail fraud.  *Jury Verdict* (ECF No. 93).[2]

Ahead of sentencing, on January 23, 2024, the Court held a telephonic presentence conference during which the parties disagreed on how the amount of loss and restitution should be calculated.  *Min. Entry* (ECF No. 116).  On February 20,

---

[2]       On August 23, 2023, Mr. Gonzalez filed a notice of appeal of the jury verdict.  *Notice of Appeal* (ECF No. 97).  But he later dismissed it.  *J. of USCA* (ECF No. 107).

2024, the Government submitted a sentencing memorandum. *Gov't Sentencing Mem.* (ECF No. 119).  On April 5, 2024, Mr. Gonzalez filed his. *Def.'s Sentencing Mem.* (ECF No. 124).

## III.   THE PARTIES' POSITIONS

### A.   Government's Sentencing Memorandum

The Government recommends that the Court order restitution in the amount of $176,714 to the Social Security Administration (SSA) "because it is mandatory under Count I, and because the [18 U.S.C. § 3663(a)(1)(B)] factors warrant ordering discretionary restitution under Count 4." *Gov't Sentencing Mem.* at 1.

### 1.   The Correct Loss Amount is Every Benefit Received in Guillermo's Name

The Government contends the Court should accept SSA's determination that its loss was $176,714. *Id.* The Government says its burden to establish the victim's losses by a preponderance is "not heavy." *Id.* (quoting *United States v. Naphaeng*, 906 F.3d 173, 180 (1st Cir. 2018) ("[A]s long as the court's order reasonably responds to some reliable evidence, no more is exigible")); *see also United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993).

The Government says it "remains unclear whether Guillermo's earnings from other years were added to existing earnings already on Napoleon's record, and if so, for which years." *Id.* at 12.  "Responsibility for this ambiguity," the Government contends, "lies with the defendant," *id.*, as "SSA has insufficient information to determine whether the Guillermo record has any earnings not already accounted for on the Napoleon record." *Id.* at 13.  The Government insists that absent such

4

information, SSA "properly treated all payments to Guillermo as a loss due to fraud, and an overpayment on Napoleon's record." *Id.* (citing 42 U.S.C. § 405(u)(3)).

Therefore, the Government contends, "the burden now shifts to the defendant to show that the agency loss calculation fails to account for unique earnings under the Guillermo record that might serve as an offset." *Id.* at 14. If the burden is not met, the Government points out that the "First Circuit has recently rejected an argument that a district court erred in accepting the face value of a loss of Social Security benefits." *Id.* (citing *United States v. Rivera-Ortiz*, 14 F.4th 91, 103 (1st Cir. 2021)). Ultimately, the Government declares that "[a]ny detriment the defendant may experience from legitimate earnings on Guillermo's record that were not transferred to Napoleon's records is the result of his failure to answer questions honestly . . .. This Court should decline to extend him any benefit of such ambiguity." *Id.* at 15.

## 2.    Restitution is Mandatory

The Government relies on 18 U.S.C. § 3663A(c)(1)(B) to argue restitution is mandatory "when a defendant is convicted of an offense in which an identifiable victim or victims has suffered a pecuniary loss." *Id.* at 2. After conceding that the "PSR analyzed the loss to SSA under the rubric of Counts 4 and 5, charges pertaining to Social Security fraud," the Government submits that the conduct in Count 1 "was a proximate cause of SSA's loss, rendering it an identifiable victim." *Id.* (citing 18 U.S.C. § 3771(e)(2)(A) (victim is "a person directly and proximately harmed as a result of a commission of a Federal offense")). This is so, the Government argues, because

5

Count 1, possession of another person's social security number, "was a necessary instrument to the offense charged in Count 4, and the defendant was further convicted of possessing it with intent to commit this offense." *Id.* at 3 (citing *United States v. Matthew*, 916 F.3d 510, 519 (5th Cir. 2019)); *see id.* at 4 (citing *United States v. Hill*, 683 F.3d 867, 870 (7th Cir. 2012)).

### 3.   Restitution is at Least Warranted

In the alternative, the Government argues that discretionary restitution is warranted based on Count IV pursuant to the 18 U.S.C. § 3663 factors. *Id.* The Government says that if restitution is granted it must be in the full amount of the victim's losses because 18 U.S.C. § 3664(f)(1)(A) applies to mandatory and discretionary restitution alike. *Id.* at 5-6 (citing 18 U.S.C. § 3556). The Government concedes "the First Circuit has not yet directly addressed this point," but says that "the Fourth, Sixth, and Seventh Circuits, have agreed with this interpretation," and "at least one district court in this circuit has followed the majority approach." *Id.* at 5-6 (citing *United States v. Coleman*, No. CR-19-10113-FDS, 2023 WL 2541089, at *2 (D. Mass. Mar. 15, 2023)).

The government submits that "[r]equiring the defendant to repay the funds he received by fraud is an integral part of an appropriate sentence" with respect to Count 4, *id.* at 7, and that the defendant has an estimated monthly income of $2,972 and reported no liabilities as evidence that "the defendant appears to have considerable ability to repay this loss." *Id.* at 8.

### B.     Defendant's Sentencing Memorandum

Mr. Gonzalez takes issue with several arguments made by the Government.

### 1.     Restitution is Discretionary, Not Mandatory

First, he contends that the SSA is not a victim within the meaning of the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, and that even if it were, the MVRA is not applicable to Title 42 offenses. *Def.'s Sentencing Mem.* at 7. Mr. Gonzalez, citing the descriptors in § 3663A, argues that "the language of section 3663A applies only to human beings" and "contains no reference to the features of corporate persons." *Id.* at 8 (highlighting descriptors in the statutory language such as deceased, age, incompetent, incapacitated, deceased, legal guardian). Moreover, he adds that "Title 18 distinguishes between organizations, individuals, departments, and agencies . . . Agencies are not persons, and agencies are not otherwise part of the definition of 'victim' in section 3663A." *Id.* Mr. Gonzalez argues that "[t]he Social Security Administration is not the victim of the offense of conviction in count I of the indictment. A representative of the estate of Guillermo Gonzalez or another appropriate person is the victim of the defendant's theft of his deceased brother's identity. 18 U.S.C. § 3663A(a)." *Id.* at 9.

Mr. Gonzalez adds that 42 U.S.C. § 408, the provision that covers restitution for Social Security offenses, only allows for discretionary restitution. *Id.* (citing 42 U.S.C. § 408(b)(1)). In his view, "[t]he SSA is the victim of the offense of conviction in count 4 of the indictment. The defendant's concealment of material information 'result[ed] in . . . benefit payments[s] that should not have been made.'" *Id.* (citing

7

42 U.S.C. § 408(b)(4)(B)).  However, says Mr. Gonzalez, § 408 only incorporates 18 U.S.C. §§ 3663, 3664, and 3612, not § 3663A.  *Id.*  "If the mandatory restitution provisions of section 3663A were meant to apply in cases where the SSA is a 'victim' of a crime, then subsection 409(b)(2) would include section 3663A with the other Title 18 restitution provisions it incorporates."  *Id.*  Mr. Gonzalez posits that as a result: "Orders of restitution to the SSA are discretionary, and the MVRA is not incorporated into the statute governing such orders."  *Id.* (citing § 408(b)(2)).

### 2.     The Government's Amount of Loss Calculation is Flawed

Mr. Gonzalez turns to the amount of loss and argues that "the government did not prove the actual amount of loss to the Social Security Administration" because it "did not calculate the difference between the total benefits paid to the defendant under the combined Guillermo and Napoleon identities and the total benefits that would have been payable to him had he properly claimed all income under the Napoleon identity."  *Id.* at 5.  He adds that "the government argues that the full amount of benefits paid to the Guillermo identity should be deemed a loss to the SSA because the government is unable to calculate the actual loss" all "while conceding that an unknown portion of those benefits may have been earned by the defendant."  *Id.* at 10.

Mr. Gonzalez offers a taxonomy for the different types of payments.  First, he finds the government's suggestion that "it is likely that years with identical earnings represent years in which Guillermo had earnings and Napoleon did not," *Gov't's Sentencing Mem.* at 12, to be "a reasonable hypothesis."  *Def.'s Sentencing Mem.* at

11.  The second group is "any year in which the Guillermo record contains earnings greater than the Napoleon record." *Id.* at 12.  If the Guillermo amount is larger, Mr. Gonzalez reasons that the amount could not have been transferred to Napoleon. *Id.* "The third category of comparison involves years in which the Guillermo record shows earnings that are lower than the Napoleon record." *Id.* Mr. Gonzalez believes it is unlikely that earnings in these years are duplicative. *Id.* The defendant then points out that it is his burden to show what amounts represent legitimate claims, but says that he is unable to do so because the government does not have access to its own actuarial and accounting methods for determining social security benefits. *Id.* at 13-14.

### 3.   The Government's Restitution Calculation is Flawed

Citing *United States v. Rivera-Ortiz*, 14 F.4th 91 (1st Cir. 2021), Mr. Gonzalez maintains that while the government can rely on the face value of benefits paid for calculating the loss pursuant to the Sentencing Guidelines, in the restitution context, the government must demonstrate actual losses. *Id.* at 14.  Mr. Gonzalez takes issue with the Government's discussion of *Rivera-Ortiz* because he believes the Government "fails to distinguish between the calculation of loss under the Guidelines and the standard of proof for an order of restitution." *Id.* at 15.  He asserts that reliance on the face value of benefits paid "is inconsistent with the standard of proof for an order of restitution and did not occur in *Rivera-Ortiz*." *Id.* (citing *Rivera-Ortiz*, 14 F.4th at 105).  It follows, Mr. Gonzalez believes, that it should not occur here. *Id.* at 16.

Mr. Gonzalez also discounts the Government's argument that SSA's determination of its loss amount is consistent with 42 U.S.C. § 405(u)(3) because "section 405(u)(3) contains an actual causation requirement of its own. The statute provides that benefits paid *on the basis of* concealment or other fraud are overpayments." *Id.* at 17 (emphasis in original). By his estimation, "[a]ny amounts owed to the defendant as a result of his actual earnings were not paid *on the basis of* his concealment of material information," and therefore were inappropriately included in the SSA's restitution determination. *Id.* at 17.

## IV.    THE LAW

The Court, following the lead of the Court of Appeals for the First Circuit, begins by differentiating between the calculation of loss demanded by the sentencing guidelines and the calculation of loss demanded by the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. *Naphaeng*, 906 F.3d at 179.

"In a fraud case resulting in financial loss, the defendant's guideline sentencing range is determined in part by calculating the greater of either the intended loss or the actual loss." *Id.* (citing USSG § 2B1.1, cmt. n.3(A)). This calculation serves "as a rough proxy for determining the seriousness of the offense and the relative culpability of the offender." *United States v. Alphas*, 785 F.3d 775, 777 (1st Cir. 2015). "[T]he Sentencing Commission amended USSG § 2B1.1 to clarify that the 'intended loss' inquiry must focus on the degree of 'pecuniary harm that the defendant purposely sought to inflict' through his conduct." *United States v. Carrasquillo-Vilches*, 33 F.4th 36, 43 (1st Cir. 2022) (citing USSG § 2B1.1, amend. 792). In that sense, the

calculation of intended loss is subjective, *see id.*, and "serves a punitive purpose, punishing the defendant for the harm that he sought to inflict." *Naphaeng*, 906 F.3d at 179 (citing *United States v. Innarelli*, 524 F.3d 286, 290 (1st Cir. 2008)).

"In contrast, restitution is designed to compensate the victim, not to punish the offender. To this end, the MVRA mandates that a defendant convicted of certain federal crimes, including those 'committed by fraud or deceit,' must make restitution to victims commensurate with the victims' actual losses." *Id.* (quoting 18 U.S.C. § 3663A(c)(1)(A)(ii); and citing *Innarelli*, 524 F.3d at 293 (noting that restitution is meant to "make the victim whole again")). Accordingly, actual loss for purposes of restitution is "limited to pecuniary harm that would not have occurred but for the defendant's criminal activity." *United States v. Alphas*, 785 F.3d 775, 786 (1st Cir. 2015). "Consistent with this logic, an order for restitution ought not to confer a windfall upon a victim." *Naphaeng*, 906 F.3d at 179 (citing *United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004)).

## A.   Calculating Amount of Loss for Guideline Enhancement

"Fraud has many manifestations, and calculating the loss associated with a particular scheme is sometimes more art than science." *Alphas*, 785 F.3d at 781. As a result, the First Circuit has "eschewed rigid rules and instead taken 'a pragmatic, fact-specific approach' to loss calculation." *Id.* (quoting *Prange,* 771 F.3d 17, 35 (1st Cir. 2014)).

This fact-specific approach deals in degrees of culpability. *See id.* ("[I]t is appropriate for the loss-computation method to distinguish between a fraudster who

wholly fabricates a non-existent claim and a fraudster who artificially inflates a legitimate claim"). "The relevant inquiry, then, is what the fraudster reasonably expected to euchre out of his victim . . .. That amount necessarily excludes any sums that the fraudster would have been paid absent the fraud." *Id.* (citing *Burrage v. United States,* 571 U.S. 204, 210-11 (2014) (explaining that the phrase "results from" typically requires but for causation). This requires sentencing courts to "determine[] whether and to what extent legitimate claims were embedded in the fraud," as "no fraudster sets out to swindle sums that he would have been paid anyway." *Id.* at 783.

As a result, in cases of government benefits fraud, "a district court should try to parse out which benefits were legitimately paid and which were not, and base the loss amount on only the latter." *Rivera-Ortiz*, 14 F.4th at 103 (citing *United States v. Arif*, 897 F.3d 1, 12 (1st Cir. 2018); and *Alphas*, 785 F.3d at 783); *see also* U.S.S.G. § 2B1.1 cmt. 3(F)(ii).

To determine the amount of loss, the Court uses a burden-shifting framework. *See Alphas*, 785 F.3d at 784 (1st Cir. 2015); *Rivera-Ortiz*, 14 F.4th at 103; *United States v. Ahmed*, 51 F.4th 12, 25 (2022); *Carrasquillo-Vilches*, 33 F.4th at 42; *United States v. De Jesús-Torres*, 64 F.4th 33, 43 (1st Cir. 2023). "It is apodictic that the government bears the burden of proving the applicability of a sentencing enhancement by preponderant evidence." *Alphas*, 785 F.3d at 784 (citing *Paneto,* 661 F.3d 709, 715 (1st Cir. 2011)). But in a case where a defendant's claims are "demonstrably rife with fraud," "a sentencing court may use the face value of the claims as a starting point in computing loss." *Id.* (citing *United States v. Campbell,*

765 F.3d 1291, 1302 n.13, 1304–05 (11th Cir. 2014); *United States v. Hebron,* 684 F.3d 554, 562–63 (5th Cir. 2012)).   "The burden of production will then shift to the defendant, who must offer evidence to show (if possible) what amounts represent legitimate claims."  *Id.* (citing *See Hebron,* 684 F.3d at 563; and *United States v. Jimenez,* 513 F.3d 62, 86 (3d Cir. 2008)).

"After the record is fully formed, the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish.  The court, however, 'need only make a reasonable estimate of the loss.'" *Id.* (quoting USSG § 2B1.1, comment. n. 3(C); *and citing United States v. Blastos,* 258 F.3d 25, 30 (1st Cir. 2001)).   "Depending on the defendant's offer of proof, the court might well conclude that the amount of loss is equal to the face value of the submitted claims."  *Id.*

## B.   Calculating Amount of Restitution

"Under the Mandatory Victims Restitution Act (MVRA), defendants convicted of certain federal crimes — including (as relevant here) those 'committed by fraud or deceit,' 18 U.S.C. § 3663A(c)(1)(A)(ii) — must make restitution to their victims to compensate the victims for their actual losses."  *Carrasquillo-Vilches*, 33 F.4th at 45 (citing *Naphaeng*, 906 F.3d at 179); *accord Rivera-Ortiz*, 14 F.4th at 105 (quoting *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002); and citing *Alphas*, 785 F.3d at 786).   "An 'actual loss' in the MVRA context 'is limited to [the] pecuniary harm that would not have occurred but for the defendant's criminal activity.'"  *Carrasquillo-Vilches*, 33 F.4th at 45 (quoting *United States v. Simon*, 12 F.4th 1, 64 (1st Cir. 2021)).

The First Circuit has "made it pellucid that 'restitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct.'" *Alphas*, 785 F.3d at 786 (quoting *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002)).

"This means that the government must establish a but-for connection between the defendant's fraud and the victim's loss." *Id.* "Mere guesswork will not suffice. The government bears the burden of proving a victim's actual loss by preponderant evidence." *Naphaeng*, 906 F.3d at 179 (citing 18 U.S.C. § 3664(e)). Put simply, "intended loss will not suffice" when calculating restitution. *Carrasquillo-Vilches*, 33 F.4th at 46.

Of course, the law "cannot be blind to the fact that criminals rarely keep detailed records of their lawless dealings, totaling up every column and accounting for every misbegotten dollar." *United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993). For that reason, "[a]ppellate courts do not demand absolute precision in the fashioning of restitution orders." *Carrasquillo-Vilches*, 33 F.4th at 46 (citing *Simon*, 12 F.4th 1, 64 (1st Cir. 2021). So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." *Savoie*, 985 F.2d at 617. "As long as a district court's restitution 'order reasonably responds to some reliable evidence, no more is exigible.'" *Carrasquillo-Vilches*, 33 F.4th at 46 (quoting *United States v. Sánchez-Maldonado*, 737 F.3d 826, 828 (1st Cir. 2013); and citing *Simon*, 12 F.4th at 64-65); *accord Naphaeng*, 906 F.3d at 180.

Ultimately, "[t]he district court need only make 'a reasonable determination of

appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim.'" *Alphas*, 785 F.3d at 786–87 (quoting *United States v. Burdi,* 414 F.3d 216, 221 (1st Cir. 2005)). At the same time, however, the Court must balance this against the consideration that "restitution orders should not generate windfalls." *Carrasquillo-Vilches*, 33 F.4th at 46 (citing *Innarelli*, 524 F.3d at 293; and *Naphaeng*, 906 F.3d at 179).

## V.  DISCUSSION

### A.  Framing

At its core, the current dispute between the parties is whether Napoleon Gonzalez's scheme where he took on the identity of his deceased brother, Guillermo, led the SSA to a loss, and if it did, how much restitution SSA should receive.

As the amount of loss for guideline enhancement and the award of restitution "determinations are controlled by different authorities," the Court bifurcates its analysis.  *United States v. Alphas*, 785 F.3d 775, 779 (1st Cir. 2015).

### B.  Amount of Loss

The Government has the burden of establishing the amount of the victim's loss by preponderant evidence.  *United States v. Cardozo*, 68 F.4th 725, 733 (1st Cir. 2023); *Alphas*, 785 F.3d at 784.    As the First Circuit instructed, the amount of loss "necessarily excludes any sums that the fraudster would have been paid absent the fraud."  *Alphas*, 785 F.3d at 781 (citing *Burrage v. United States,* 571 U.S. 204, 210-11 (2014).  The Government, then, must present the Court with a figure that

represents "what the fraudster reasonably expected to euchre out of his victim." *Alphas*, 785 F.3d at 781.

The Government offers the face value of all the payments SSA made to Guillermo Gonzalez's Social Security number—$ 176,714—as the amount of loss. To support the entirety of the benefits paid as the appropriate starting point, the Government relies on the testimony of Social Security Administration Assistant District Manager Karam, which is that "if the defendant had truthfully answered that he'd previously filed an application for benefits, SSA would have been able to establish that he was one person with two records, and it would have cross-referenced these records." *Gov't's Sentencing Mem.* at 11. The Government contends that "[b]ut for the defendant's fraud, SSA would never have approved an application for RSI under Guillermo's name." *Gov't's Sentencing Mem.* at 15. Therefore, the Government argues the Court should hold the defendant accountable for the face value, just like in *Rivera-Ortiz*. *Id.*

The Court remains unconvinced that the $176,714 payments to Guillermo Gonzalez received by Napoleon Gonzalez represents a loss to the SSA. Guillermo Gonzalez died shortly after his birth. As a result, any work done under the Guillermo name was done by Napoleon. Any salary earned under the Guillermo name was actually earned by Napoleon. Any taxes and monies paid into the Social Security system by Guillermo were paid in by Napoleon. As follows, the Social Security benefits amassed in Guillermo's name came about because of Napoleon's work. Put differently, if Napoleon had done the work in his own name the entirety of the time,

16

he would have been entitled to receive Social Security benefits for that work.  As Napoleon Gonzalez did the work and earned the Social Security benefits, it remains unclear what loss the SSA incurs in conferring those benefits to him—even if they were conferred to a different name.

Perhaps an analogy can help make the point.  If someone works for ten years using their maiden name, ten years under their married name, and after a divorce returns to their maiden name, they still earn their benefits by paying into the system.  Regardless of which name the benefits are ultimately paid to, the person earned them, and there is no loss for the SSA.

Approached from a different angle: the record seems underdeveloped as it remains unclear what, if anything, would have changed benefits-wise if Mr. Gonzalez's records were cross-referenced.  Would Napoleon have been eligible for fewer benefits if the SSA cross-referenced the Napoleon and Guillermo accounts?  If so, by how much?  The record does not indicate when Napoleon worked under his own name, what he did work during that time, how much money he earned, and how much he earned in Social Security benefits during that time.  The record does not answer those questions for the period Napoleon worked as Guillermo.  Nor does it show whether SSA paid out more to Napoleon because of his two identities than they would have had to pay him if he always worked under the name Napoleon.  The Court remains unconvinced that $176,714 represents what Mr. Gonzalez expected to euchre out of the SSA as there are necessarily legitimate claims embedded in this total amount, suggesting $176,714 is an overestimate.  *See Alphas*, 785 F.3d at 783.

17

It is true that but for Mr. Gonzalez's fraud, the Court and the Government would not be faced with the task of trying to figure out how the payments to Mr. Gonzalez would have been reduced if he only had one identity.    The Government argues that the "[r]esponsibility for this ambiguity lies with the defendant." *Id.* at 12.

However, the Government prematurely shifts the burden to the Defendant. The burden would shift to Mr. Gonzalez, *see Rivera-Ortiz*, 14 F.4th at 103; *Alphas*, 785 F.3d at 784, only if the Court accepts the Government's face value amount.  After all, *Alphas* instructs that the court "*may* use the face value of as a starting point," not that it must.  785 F.3d at 784 (emphasis supplied).  As the Court has explained, the facts in this case do not support accepting the face value as the starting point because it seems to consist of money that Mr. Gonzalez earned—albeit while working under his brother's name.

A close look at *Rivera-Ortiz*, a First Circuit case the Government relies on, helps elucidate the point.  In *Rivera-Ortiz*, the trial court found that the defendant was "getting the benefit of everything" because he failed to report, as a result his benefits were not recalculated, and the defendant's "intent [wa]s to get the entire benefit and you just can't separate that."  14 F.4th at 103 (quoting and affirming the trial court).  Additionally, the First Circuit found that "there was some evidence that, absent Rivera's concealment, he would have received no benefits at all."  *Id.* at 105. This made the face value an appropriate starting point.

Here, however, it remains unclear what Mr. Gonzalez's intent was, and more importantly whether he received any benefit from the SSA that he would not otherwise have received but for his fraud. Yes, the records of Guillermo and Napoleon would have been cross-referenced if Mr. Gonzalez adequately reported both identities but no one seems to know to what avail.

"[T]he Sentencing Commission amended USSG § 2B1.1 to clarify that the 'intended loss' inquiry must focus on the degree of 'pecuniary harm that the defendant purposely sought to inflict' through his conduct." *Carrasquillo-Vilches*, 33 F.4th at 43 (citing USSG § 2B1.1, amend. 792). "The relevant inquiry, then, is what the fraudster reasonably expected to euchre out of his victim . . .. That amount necessarily excludes any sums that the fraudster would have been paid absent the fraud." *Alphas*, 785 F.3d at 781. The conundrum here is that Mr. Gonzaleze earned at least some (undetermined) portion of the $176,714 that the SSA paid him. Said another way: if part of the funds were earned by Mr. Gonzalez, then they are "legitimate claims embedded in the fraud," *id.* at 783, and SSA would have had to pay these claims to Mr. Gonzalez even if he had not engaged in fraud. As "no fraudster sets out to swindle sums that he would have been paid anyway," it is not reasonable to characterize the entirety of the $176,714 as "loss" suffered by SSA. *Id.*

The Government correctly points out that its burden is "not heavy." *Gov't's Sentencing Mem.* at 8. "As long as the court's order reasonably responds to some reliable evidence, no more is exigible." *Naphaeng*, 906 F.3d at 180. But this reliable evidence does not exist for $176,714 as the loss amount. As currently presented and

defended, this face value calculation does not meet the Government's burden of proof by preponderant evidence as it does not appear to have "the most convincing force" nor is it "sufficient to incline a fair and impartial mind to one side of the issue rather than the other." *Preponderance of the Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019). Therefore, the Court is not inclined to accept $176,714 as the appropriate amount of loss.

### C. Whether Restitution is Mandatory, Discretionary, or Neither

The MVRA, codified at 18 U.S.C. § 3663A, provides that "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court *shall order* . . . that the defendant make restitution to the victim of the offense, or if the victim is deceased, to the victim's estate." 18 U.S.C. § 3663A(a)(1) (emphasis supplied).

Subsection 3663A(c) includes a two-part test for determining whether an offense requires restitution. Subsection 3663A(c)(1)(A) spells out which offenses require restitution, ranging from crimes of violence as defined in Section 16 of the United States Code to offenses relating to the theft of medical products under Section 670. *See id.* § 3663(c)(1)(A)(i)-(v). Relevant here, one such crime is "an offense against property under [Title 18] . . . including any offense committed by fraud or deceit." *Id.* § 3663(c)(1)(A)(ii).

A jury found Mr. Gonzalez guilty of count I of his indictment, identity theft, a violation of 18 U.S.C. 1028(a)(7), for his possession of a Social Security number and United States passport that belonged to his deceased brother, Guillermo Gonzalez.

This meets the first requirement for mandating restitution under the MVRA.  *See* 18 U.S.C. § 3663A(c)(1)(A)(ii).

The second requirement is contested.  Subsection 3663A(c)(1)(B) is the second part of the conjunctive test; it requires that "an identifiable victim or victims has suffered a physical injury or pecuniary loss" as result of one of the named offenses.

Mr. Gonzalez disagrees that the second requirement, an identifiable victim who has suffered a physical injury or pecuniary loss, exists.  He argues under Title 18, the Social Security Administration fits the definition of an agency and "[a]gencies are not persons, and agencies are not otherwise part of the definition of 'victim' in section 3663A," as "the language of section 3663A applies only to human beings, *i.e.*, 'individuals as defined by Title 18." *Def's Sentencing Mem.* at 8 (citing 18 U.S.C. §§ 6, 3663A).  In response, the Government argues Mr. Gonzalez's identity theft was a "necessary instrument" to him committing Social Security fraud, thereby rendering the conduct the "proximate cause" of SSA's loss.  *See Gov't's Sentencing Mem.* at 3-4.

The Government's position is unconvincing.  It is not clearly established in the record that Count I, identity theft, led to any pecuniary loss.  Assuming it did, the Government's position fares no better.  As Mr. Gonzalez points out, the MVRA's definition of victim states in its entirety:

> For the purposes of this section, the term "victim" means a person directly and proximately harmed a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.  In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the

victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. § 3663A(a)(2). All the references to characteristics that only human beings can have—such as mental states—makes Mr. Gonzalez's reading—that a person, not an agency, must be the victim who restitution is paid to—more plausible than the Government's. As defined in the relevant provision, an agency is not a victim. Moreover, the provision explicitly states what should occur in the case of a victim who is deceased: the representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights. The SSA does not represent Guillermo Gonzalez's estate, nor is it his family member, nor is it a *person* appointed as suitable by the court to do so. As such, the Court concludes restitution to the SSA is not mandatory under the MVRA as to Count I, identity theft, as the SSA does not meet the requirements of 18 U.S.C. § 3663A.[3]

In the alternative, the Government argues that discretionary restitution is warranted on the basis of Count IV, Social Security benefit fraud via concealment, a violation of 42 U.S.C. § 408(a)(4), (a)(9). *Gov't Sentencing Mem.* at 5. Mr. Gonzalez concedes that "[t]he SSA is the victim of the offense of conviction in count 4 of the indictment [as t]he defendant's concealment of material information resulted in benefit payments that should not have been made." *Def.'s Sentencing Mem.* at 9

---

[3]     The Court notes this aligns with the United States Probation Office's analysis. *See Revised Presentence Investigation Report* ¶ 18 (ECF No. 113) ("Count 1: The defendant's deceased brother is technically a victim of Identity Theft, however, in this case, and pursuant to 18 U.S.C. § 3664, there does not appear to be a victim that would otherwise require the Court to make a ruling on restitution").

(cleaned up) (citing 42 U.S.C. § 408(b)(4)(B))). But he protests the Government's position that the MVRA is relevant, arguing that "*only* sections 3663, 3612, and 3664 of Title 18 apply to orders of restitution in cases where the SSA is a 'victim.'" *Id.* (citing 42 U.S.C. § 408(b)(2)).

42 U.S.C. §§ 408(b) outlines the restitution for violating § 408(a):

**(1)** Any Federal court, when sentencing a defendant convicted of an offense under subsection (a), may order, in addition to or in lieu of any other penalty authorized by law, that the defendant make restitution to the victims of such offense specified in paragraph (4).

**(2)** Sections 3612, 3663, and 3664 of Title 18 shall apply with respect to the issuance and enforcement of orders of restitution to victims of such offense under this subsection.

**(3)** If the court does not order restitution, or orders only partial restitution, under this subsection, the court shall state on the record the reasons therefor.

**(4)** For purposes of paragraphs (1) and (2), the victims of an offense under subsection (a) are the following:

    **(A)** Any individual who suffers a financial loss as a result of the defendant's violation of subsection (a).

    **(B)** The Commissioner of Social Security, to the extent that the defendant's violation of subsection (a) results in--

        **(i)** the Commissioner of Social Security making a benefit payment that should not have been made; or

        **(ii)** an individual suffering a financial loss due to the defendant's violation of subsection (a) in his or her capacity as the individual's representative payee appointed pursuant to section 405(j) of this title.

**(5)(A)** Except as provided in subparagraph (B), funds paid to the Commissioner of Social Security as restitution pursuant to a court order shall be deposited in the Federal Old-Age and Survivors Insurance Trust Fund, or the Federal Disability Insurance Trust Fund, as appropriate.

    **(B)** In the case of funds paid to the Commissioner of Social Security pursuant to paragraph (4)(B)(ii), the Commissioner of Social Security shall certify for payment to the individual described in such paragraph an amount equal to the lesser of the amount of the funds so paid or the individual's outstanding financial loss, except that such amount may be reduced by the amount of any overpayments of benefits owed under this subchapter, subchapter VIII, or subchapter XVI by the individual.

23

42 U.S.C. § 408(b).

Subsection 408(b)(1)'s use of the phrase "may order" makes clear that the Court has discretion to decide whether restitution is appropriate, rendering the mandatory restitution subsection, 18 U.S.C. § 3663A, irrelevant.  Subsection 408(b)(2) cross-references three sections of Title 18 that outline the requirements, considerations, and procedures for issuing and enforcing an order of restitution.  Subsection 408(b)(4) indicates the Commissioner of Social Security may be considered a victim under § 408(a) "to the extent that the defendant's violation of subsection (a) results in" the Commissioner "making a benefit payment that should not have been made."  *Id.* § 408(b)(4).

As the parties agree and the Court concurs that the Commissioner made benefit payments that should not have been made due to Mr. Gonzalez's chicanery, the Court may order restitution.  The question, then, becomes whether the Court should grant restitution, and, if so, how much.

### D.    Amount of Restitution

18 U.S.C. § 3663, incorporated by § 408(b)(2), mandates that a Court determining whether to order restitution under the provision consider "the amount of loss sustained by each victim," "the financial resources of the defendant, the financial needs and earning ability of the defendant, and such other factors as the court deems appropriate."  18 U.S.C. § 3663(B)(i)(I)-(II).

The First Circuit has stated that ultimately "[t]he district court need only make 'a reasonable determination of appropriate restitution by resolving

24

uncertainties with a view towards achieving fairness to the victim.'" *Alphas*, 785 F.3d at 786–87 (quoting *United States v. Burdi,* 414 F.3d 216, 221 (1st Cir. 2005)).  At the same time, however, the Court must balance this against the consideration that "restitution orders should not generate windfalls." *Carrasquillo-Vilches*, 33 F.4th at 46 (citing *Innarelli*, 524 F.3d at 293; and *Naphaeng*, 906 F.3d at 179).

Without a loss calculation that demonstrates what the victim here, the SSA, actually lost, it is not clear what would achieve fairness to the victim.  At the moment, the Court is not convinced that any SSA payment received by Mr. Gonzalez does not trace back to work he actually performed under both names and to his paying into the Social Security coffers.  If that is the case, any restitution ordered would generate a windfall for the SSA and run contrary to First Circuit guidance.  *Carrasquillo-Vilches*, 33 F.4th at 46 (citing *Innarelli*, 524 F.3d at 293; and *Naphaeng*, 906 F.3d at 179).

In *Naphaeng*, the First Circuit found that "[t]he government's information, coupled with the appellant's own admissions, supplied more than a modicum of reliable evidence."  906 F.3d at 180.  There, "the government proffered a detailed spreadsheet, describing its extensive efforts to trace and contact all of the persons defrauded over the sixteen-month duration of the scheme.  This spreadsheet identified four groups of victims and summarized all of the relevant information in the government's possession, including how much money each victim had paid to the appellant and the method of payment."  *Id.*

Here, such reliable evidence does not exist.  Instead, the Government asks the Court to presume that every dollar payment made from SSA to Guillermo Gonzalez is loss that was caused by Napoleon Gonzalez's fraud.  As "[c]ausation cannot simply be assumed," the Court is unconvinced it is proper to use its discretion to require restitution in light of this evidentiary void.  *United States v. De Jesus-Torres*, 64 F.4th 33, 44 (1st Cir.), *cert. denied sub nom. Jesus-Torres v. United States*, 144 S. Ct. 207 (2023).

Unsure that there is any loss to the SSA, the Court does not reach whether Mr. Gonzalez is able to pay restitution.

## VI.   SUMMARY

Even after reviewing the parties' sentencing memoranda, the Court remains unsure that the SSA sustained a cognizable loss from Napoleon Gonzalez's use of two identities.  The Court does not conclude that the Government could not prove a loss, only that on the record before it, the Government has not done so.  Accordingly, the Court defers ruling on whether a sentencing enhancement or restitution order are appropriate in sentencing Mr. Gonzalez.  The Court will schedule a follow-up conference of counsel to discuss what happens next.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of July, 2024